62 So.2d 454

**STATE v. ALABAMA GAS CORP.**

**3 Div. 571.**

Supreme Court of Alabama.

Oct. 23, 1952.

Rehearing Denied Jan. 19, 1953.

Douglas Arant, John J. Coleman, Jr., and White, Bradley, Arant, All & Rose, all of Birmingham, for appellee.

Si Garrett, Atty. Gen., and M. Roland Nachman, Jr., Asst. Atty. Gen., for appellant.

FOSTER, Justice.

◼ The question here is whether regulators used by appellee taxpayer in the preparation and distribution of gas to consumers are exempt from the State's use tax law. The trial court, on appeal to it from an assessment by the State Department of Revenue, held that those machines are exempt under section 789 (p), Title 51, Pocket Part, Code. That statute exempts from such tax machines "used in mining, quarrying, compounding; processing, and

manufacturing of tangible personal property". The regulators are not claimed to be used in mining, compounding or manufacturing of tangible personal property, but the taxpayer claims that they are used in processing it. They operate upon gas which of course is tangible personal property. They are not exempt unless the machines serve to process the gas.

The testimony of taxpayer's vice-president (Mr. Puryear) in charge of operating its business in Alabama, with respect to the use of those machines, is that they are placed "in the entrance of the gas service into the consumer's house pipe—there are a few large type regulators used in the general distribution. In other words, we purchase our gas, the natural gas purchased, from a pipeline company; this gas is delivered to us at a predetermined pressure, and before it goes into the various parts of our distribution system we have to use large regulators in order to reduce the pressure in our distribution system within the city, and that pressure in minimum pressure systems is in turn reduced through a service regulator at each individual house there in order that it is usable for consumers." Gas is received by the taxpayer at a specific delivery point for each community on the outskirts of the community. A regulator is there used to cut down the pressure into the lines of the taxpayer. The pipeline company owns the regulators that are in its meter and regulating systems. Sometimes the taxpayer reduces the pressure then and there and sometimes at other points dependent upon the distance it has to go and other circumstances. In the distribution system not over three reductions are made, a high pressure main system, an intermediate and low pressure. The density of population is influential in fixing the amount of the pressure. It must also be reduced to a safe pressure, and with a constant flow, as it goes into a house for consumption. The gas that enters the regulator is not of a usable pressure. The purpose of the regulator is to reduce the pressure so that it is usable for the purpose there arranged, and to keep it regulated and steady at that pressure, and to shut off the flow of gas when it is not being used. Without a regulator the gas cannot be used in domestic appliances. When it flows through a regulator there is a temperature drop between the inlet and outlet pressure due to refrigeration force in the expansion of the gas. In large regulators there are a number of degrees of difference. The change from high to low pressure is accomplished by permitting the gas to pass through a small opening at the control rod. When gas is under pressure at thirty pounds there are more BTUs in a cubic foot than there are in a cubic foot of gas under a less pressure, because there is more gas in a cubic foot of compressed gas. The pressure of gas delivered to a consumer depends upon his manner of use. Sometimes its high pressure is not reduced for industrial users.

Taxpayer's witness Harvey Luoma testified that he had been employed by the taxpayer for four years, and graduated at the University of Wisconsin in electrical engineering, and was familiar with regulators used by taxpayer, which he explained substantially as did Mr. Puryear. As he expressed one feature of it, "in the process of compression gas would be heated, usually in process of expansion, cooling." Pressure generates heat. "The regulator is a mechanical device designed for a two-fold purpose, first to reduce gas pressures to utilizable flows, lower flows; also to automatically maintain the outlet pressure at a constant flow, even though we have a variation of the inlet flow pressure, to regulate the flow of gas through the regulator, even though it may vary." A regulator cannot increase the pressure of gas as it is received in it. The change of temperature to be cooler as it leaves the regulator is purely incidental and is not an aid in marketability.

The State's expert witness Thigpen testified:

"The regulator is used, as I see it from observation and examining it, is used as a valve to control the gas going through it; it is used on a pressure system, a diaphragm pressure regulated with a spring of given tension, that

spring being regulated by an adjusting nut at the top of the regulator itself thus activating an arm that opens and closes a valve to regulate the amount of gas and the pressure of the gas going through it."

Its function is to maintain automatically as to the outgoing gas a substantially constant pressure and volume. The chemical composition of gas which leaves the regulator is exactly the same (as when it enters). As to an electric transformer, he testified:

"The electricity generated by a transformer is new electricity, or electric current generated upon the same principles as in the first instance by the use of a generator, as the electric current coming to a transformer doesn't pass through to the other side, but the use of a transformer changes the quantity of the current on the opposite side of the transformer. * * *

"There is hardly any way to make a comparison because they (a transformer and a regulator) are not comparable. * * *

"They are not comparable due to the fact a regulator is something to regulate, exactly what the name implies; it regulates the flow of a particular substance. And a transformer is exactly what the name implies, it transforms one thing into another. As the word might be explained, a transfiguration by pressure from one thing to another, which means a change is the way I understand it." (The witness has never had experience in the gas or electric business.)

In the case of Curry v. Alabama Power Co., 243 Ala. 53, 8 So.2d 521, the Court was dealing with two features of the exemption in question. One was in the use of machines in the manufacture of tangible personal property, the generators; and the other in the processing of such property. As to the generators, the only question was whether electricity is tangible personal property. We held that it is and,

therefore, generators were exempt. The inquiry required an entry into a field about which all its elements and characteristics may not be known, particularly in its transmission. But transformers are necessary to step down the voltage for domestic and other uses. We held that transformers are machines used in processing it.

The result is quite similar to that reached in the use of regulators for reducing the pressure of gas to get it suitable for use by many customers, who could not otherwise use it. There was some difference of opinion and candid uncertainty manifested in the expert testimony in the Curry case, supra, as to whether the same electrons which go into a conductor come out of it, or whether they stimulate a flow of electrons of the same sort in the conductor. It is perhaps a more complicated machine than the regulator. But a transformer operates on electricity which has been otherwise produced and conducted to it, and reduces the pressure as desired for the purpose at hand. A regulator accomplishes the same purpose. Whether there is a change in the electrons in the transformer in their flow, or whether those which go out are the same as those which go in, is a technical question. The identical result follows in either theory. They both take in tangible personal property otherwise produced and send out a product of exactly the same elements, but processed to reach a status which is necessary to accomplish a desired purpose. Processing does not always mean the same thing as in State v. Try-Me Bottling Co., Ala.Sup., 57 So.2d 537.[1] That is but an illustration of it, not necessarily applicable to all situations.

We have reached the conclusion that the appliances in question are used in processing gas, which is tangible personal property, so as to make it suitable for domestic and certain other uses, and therefore exempt from the use tax mentioned in section 789 (p), Title 51, Pocket Part, Code. Such was the decree of the circuit court, in equity, and it is affirmed.

Affirmed.

All the Justices concur.

1. 257 Ala. 128.